## Lithuanian Club Association v. Pickering

*Frank Garrigan* and *Anthony Rosini,* for plaintiffs.

*Robert Fitzpatrick,* for defendants.

KREHEL, *P.J.,* July 14, 1978 — This hearing judge has determined, from a comprehensive review of the record, and from in-depth research, and search for applicable concepts in law, the following

## FINDINGS OF FACT

1. Plaintiff is an association of persons, chartered as a non-profit social and cultural organization, initiated in the Coal Township-Shamokin area at the turn of the century, by immigrants from Lithuania, intending to preserve their cultural heritage in this land of freedom, after centuries of oppression by Czarist Russian rulers.

2. The Lithuanian Club and Society, presently located in social rooms and meeting hall at 1135 Chemung Street, Coal Township, Post Office Shamokin, sponsored a softball team in 1975, 1976, and 1977, composed of younger regular and social members, who participated in the Intercity Softball League.

3. Sponsorship of such an aggregation of softball team players included purchase of uniforms, payment of league fees, payment of field rental fees, payment of insurance coverage, purchase of bats, balls, and related equipment, such as shin-guards, chest-protector, and face mask.

4. Payments for such costs enumerated in the aforegoing paragraph were in the form of "donations" from the "Lithuanian Club Association and Society" to the "Lithuanian Club Sports Activities Fund," a separate account established for the con-

venience and the practical day-to-day operation of the softball team.

5. The "old country cultural heritage" organization engaged in various fund-raising projects and activities, from which money was generated to field the "sports tradition" team in the American game of fair play and competitive combat with cylindrical wooden wands and small soft spheres, called softballs.

6. The Lithuanian Club's "Booster Board," "five-week" club, "50/50" chances, and "$3.00 Day" events, raised funds which became the "donations" to the softball team carrying the colors onto the playing field and playing the national sport that is a business and a game, an entertainment and enterprise. Funds from the "Club" became fun for the "Team."

7. In the 1975, 1976, and 1977 softball seasons, the "Team" representing the "Club" did not have heroes born, nor careers ended. No fortunes were made, nor lost. Philosophies and tactics sometimes failed, and sometimes succeeded. And the frailities of the human bodies, minds, and spirits, of both the "Club" members and the "Team" players, were tested over and over again.

8. The thousands of pitches thrown during the softball seasons generated unbounded elations, and untold frustrations, on the playing fields. These emotions of the "Team" were carried into the social rooms and meeting hall of the "Club," igniting elations and heating frustrations. Friction began from alleged "non-cooperation," and "lack of patronage" by the "Team" players, hurled by "Club" members, thereby jeopardizing sponsorship of the 1978 team.

9. Uncertainty of the "full donations" by the "Club" to the "Team" resulted in the "Team"

players entering the Intercity Softball League under the banner of "Pickering's Sunoco," funded and managed by John Pickering, one of defendants herein. Pickering had managed the Lithuanian Club Team.

10. The alleged failure of the "Team" players to turn in their softball uniforms, consisting of softball shirts and softball pants, the 15 to 20 bats, the 15 to 20 softballs, shin-guards, chest-protector, face mask, and 20-gallon water cooler, precipitated this lawsuit in replevin to recover the "property" allegedly that of the "Club." The alleged value of said "property," as of April 15, 1977, was $1,750.

11. The "Club" members and officers who testified had been "Team" players, and a sufficient number of younger members of the "Club" know the game, or have engaged in the play of the game of softball.

## DISCUSSION

The ownership of "property," as between the "cultural heritage" club sponsor, and the "sports tradition" team players, is a technically legal one, governed by Pa.R.C.P. 1071, et seq.

This issue has kindled hostility and animosity. It has set brother club members and team players in combative postures. Any resolution of the quarrel "on paper" would fail to quench the fired passions. This court will reduce it to writing later.

It appears, therefore, that the solution to restore reason amongst club members and team players should involve the American tradition of fair play.

We will direct, accordingly, that "play ball!" is the next step, and enter the following

ORDER

During the intervening period of the continued hearing, and the rescheduling of another hearing within 40 days, plaintiff club shall select from amongst its membership such roster of players (as prescribed by league rules) to field a softball team, and to engage in a softball contest or game of seven innings of play against the team roster of defendants, presently flying the colors of "Pickering's Sunoco."

Such softball game shall be scheduled for Saturday, August 5, 1978, at 4:00 o'clock p.m., on the Faust Field, Ferndale, with rain-date scheduled for Sunday, August 6, 1978, at 4:00 o'clock p.m., on the Faust Field, Ferndale.

This hearing judge will act as plate umpire (in the tradition of a war-time tent mate, former National League Umpire "Augie" Donatelli), designating his law clerk, Attorney H. Robert Mattis, Jr., as base umpire, his court reporter, John Onesi, as official scorekeeper, and his court crier, Joseph Mercury, as the home plate duster.

Failure to participate as players or officials shall be a violation of this order, and such violator shall be held in contempt of this court, and confined immediately for such period of time until he shall purge himself of such direct contempt.

Benefit game tickets for one dollar, as complimentary admission, shall be offered for public sale, and the cost of printing the said tickets shall be personally donated by this hearing judge.

The net proceeds from this special benefit softball game shall be earmarked *in part* to reimburse the Lithuanian Club Association and Society, with the greater portion of proceeds "donated" to the Inter-

city Softball League treasury, as a contribution to undergird this great American sport as played and viewed by spectators from 100,000 people in Northumberland County, Pennsylvania.

Any additional details of arrangements to co-ordinate this event are delegated to the security officer of this court, Chester A. Gard, and to coach Bernie Romanoski, as co-chairmen of a committee of their choice.